# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| **KESSLYN BRADE STENNIS,** | * | |
| | * | |
| *Plaintiff,* | * | |
| | * | |
| v. | * | Case No. PX[1] 16-cv-1362 |
| | * | |
| **BOWIE STATE UNIVERSITY,** | * | |
| | * | |
| *Defendant.* | * | |

## MEMORANDUM OPINION

Pending before the Court and ready for resolution is Defendant Bowie State University's ("BSU" or the "University") Motion for Summary Judgment. ECF No. 37. The matter is fully briefed, and a hearing was held on February 21, 2019. For the reasons given, the Court denies Defendant's Motion.

### I.     Factual and Procedural Background

In 2009, Stennis began working at BSU as a tenure track faculty member in the Department of Social Work ("DSW"). ECF No. 37-3. Throughout her employment, Stennis received positive performance reviews, and according to her 2012–2013 evaluation, exceeded expectations in her job performance. ECF No. 46-2. After receiving two extensions to apply for tenure, Stennis' tenure review was scheduled for the 2013–2014 academic year. ECF No. 37-3; ECF No. 37-4.

In the Fall of 2012, Stennis attended a social work conference with social work students and her direct supervisor and Chair of the Social Work Department, Dr. Andre Stevenson. ECF No. 46-7. Prior to the conference, Stevenson announced to the students that "we're all going to

---

[1]     The Court recognizes with deep sadness the passing of the Honorable Roger W. Titus, necessitating transfer of this case. This Court has thoroughly reviewed the pleadings and has listened to the oral arguments that took place on February 21, 2019, before Judge Titus. The following is the Opinion of Judge Xinis.

this conference and as you all know there are two gay males going and I need you to sign some document to say that you're okay with sharing housing with these gay males." *Id.* After the meeting, Stevenson shared with Stennis that he was not comfortable with "the whole gay thing." *Id.* at 44.

In the Spring of 2013, Stennis discussed with Stevenson that one student had requested adding a course in the Social Work Department about homosexuality. ECF No. 37-9. Stevenson rejected the idea, declaring that no such course would be offered "on his watch." *Id.* In April and May 2013, Stennis shared concerns with Stevenson "about female students' treatment by [him]." *Id.*; ECF No. 46-7 at p. 26. Stevenson asked Stennis to speak with the members of the Social Work Club, of which Stennis was the faculty advisor, to see what they thought of him. ECF No. 46-7, at p. 27.

In May 2013, Stennis and Stevenson met to discuss her performance evaluation for the 2012–2013 academic year. ECF No. 37-9. Under "areas for further development," Stevenson noted that on several occasions Stennis had misadvised students and cancelled classes without forewarning. ECF No. 46-9. Stennis responded by noting on her evaluation that Stevenson could not provide any evidence of mis-advisement and by listing the various ways students were notified of cancelled classes. *Id.* In the same meeting, Stennis "expressed concern to Dr. Stevenson about how the gay students within the DSW were being treated by Dr. Stevenson." ECF No. 37-35. Also in May, Stennis attended a retreat for the Social Work Club's executive board. ECF No. 46-2. There, Stennis inquired about Stevenson's performance as Chair, as he had requested. *Id.* Several students expressed concern that Stevenson unfairly treated students based on gender and sexual orientation. *Id.*

On September 3, 2013, Stennis sent Stevenson a memo entitled "Assessment of Dr. Stevenson, Chair," which memorialized the information that Stennis learned at the Social Work Club's retreat. ECF Nos. 37-3, 37-5 ("the assessment"). The assessment stated, in relevant part:

> Favoritism: Students feel that there is clear evidence of unfair discrimination and favoritism shown to them by the Chair and specific faculty members. If not addressed, such actions could warrant a decrease in SOWK [Social Work] majors, more clearly seen faculty discord, and even legal actions (ie. Law suits).

ECF No. 37-5. Stennis also communicated to Stevenson that the nature of the student complaints centered on Stevenson's discriminatory acts and words toward gay and lesbian students. ECF No. 37-3. Two days later, Stevenson responded to the assessment, stating: "For the record: I didn't ask you or the Social Work Club e-board for an assessment of me as Chair. I asked you to ask them how I could further assist/support them in their efforts as a club." ECF No. 37-7.

Six days later, on September 9, 2013, Stevenson added a co-advisor to the Social Work Club to work alongside Stennis "[a]s a result of what [he] considered to be inappropriate behavior" of Stennis in having conducted the assessment. ECF No. 37-17. Stevenson's reason for adding a co-advisor was in direct response to Stennis submitting the assessment. *Id.* "Even if requested," Stevenson writes, "such an 'assessment' could not be accurately done within 10 days. As a result of what I considered inappropriate behavior, I assigned another faculty member to serve as co-advisor of the Social Work Club." *Id.* At the same time, Stevenson also added co-advisors to at least one other student organization "[i]n an attempt to become more transparent and collegial." ECF No. 37-8.

Two days after the co-advisor change, Stennis, Stevenson, and Jerome Schiele, Dean of the School of Professional Studies, met to discuss the assessment. ECF Nos. 37-3, 37-6. During this meeting, Stennis raised the students' concerns regarding discrimination against gay and female students. ECF Nos. 37-3, 37-6.

On September 13, 2013, Stennis was notified of her eligibility to apply for tenure. ECF No. 37-34. On September 25, 2013, Stennis notified Elizabeth Stachura, BSU Labor and Employee Relations Manager who was also the University's acting Title IX officer, of the adverse actions Stevenson had taken against Stennis since the assessment had been communicated to him. ECF Nos. 37-3, 37-10, 37-36. Stennis conveyed to Stachura the students' concerns regarding Stevenson discriminating against homosexual and female students, as well as her concern of "how all of this was impacting [her] . . . tenure process." ECF No. 37-3. In response, Stachura's only suggestion was that Stennis speak with Stevenson directly about her concerns and ask him for "ways and areas" she could improve her performance. ECF Nos. 37-9, 37-36.

Stennis took Stachura's advice, and on October 1, 2013, met with Stevenson to discuss her tenure application, among other things. *See* ECF No. 37-11. As a follow-up to the meeting Stevenson emailed Stennis the next day to express concerns about her advisement of students even though he had not raised this issue during their meeting about Stennis' job performance. *See id.*; ECF No. 37-3. Stennis, fearing Stevenson's "mis-advisement" claim could be used against her in the tenure process, responded that she had no knowledge of such issues but remained willing to review any student files to discuss specific advisement concerns. ECF No. 37-3, ECF No. 37-11. Stevenson replied that he would review student files with Stennis but only with Dean Schiele present. ECF No. 37-11.

On October 11, 2013, Stennis submitted two copies of her tenure dossier to Stevenson. ECF No. 37-3. In response, Stevenson notified Stennis that she was required to submit three copies. ECF No. 37-12. After confirming with the University's Appointment, Rank, and Tenure ("ART") Committee Chair that three copies were required, Stennis asked Stevenson whether she could submit additional materials to supplement her application and an additional copy of her

dossier.  ECF No. 37-14.  Stevenson responded that he would include one additional article provided by Stennis but would not accept additional copies of her dossier.  *Id.*  As grounds, he noted "slight" inconsistencies between the two submitted copies and that the third copy, if submitted, would be late.  ECF Nos. 37-12, 37-14.

Soon after this interaction with Stevenson, Stennis again reached out to Stachura regarding concerns that Stevenson may undeservedly interfere with her ability to receive tenure.  Stachura, once again, offered little assistance other than to recommend more discussions, this time with Dean Schiele.  ECF Nos. 37-10, 37-36.  Stachura also sent Stennis a copy of the Grievance Process from the Faculty Handbook, although Stachura cautioned that the grievance process was not an appropriate venue to pursue discrimination complaints.  ECF No. 37-15.  Stachura also suggested that Stennis follow up with Schiele.  *Id.*; ECF No. 37-36.

On November 8, 2013, Stennis met with Schiele to discuss the mis-advisement concerns raised by Stevenson.  ECF No. 46-2.  After a review of student files, Schiele agreed that the concerns were unsubstantiated.  *Id.*

On November 12, 2013, Stachura spoke with Schiele about Stennis' complaints.  ECF Nos. 37-10, 37-36.  According to Stachura's notes taken during this conversation, the two discussed Stennis as a faculty member who "cares about students."  ECF No. 37-10.  The notes also reflect discussion of someone unidentified in the notes as being described as "not collegial," "dictatorial," "abrasive," and "rude."  *Id.*  The notes also reflect discussion about "students['] fear of reprisals/retaliation," and that "2 faculty had concerns: last 6 including Stevenson," and that one particular action item included to "go over faculty evals of him."  *Id.*  Although by affidavit, Stachura confirmed her conversation with Schiele, she does not decipher with any more particularity her notes.

On November 13, 2013, Stennis' husband called the University President's office on behalf of a University social work student who was also on the executive board of the Social Work Club, complaining about an advisement matter involving the student. ECF Nos. 37-3, 37-16, 37-17. The matter appears wholly unrelated to Stennis as a professor in the department. Although Stennis explained that this student for whom her husband called had become very close with her family, both Schiele and Stevenson found the call to be "highly inappropriate." ECF No. 46-7 (Stennis describing student as "part of the family"); ECF Nos. 37-16, 37-17, 37-37. However, neither Dean Schiele nor Stevenson could justify the basis of such characterization, nor did either take any formal action against Stennis related to her husband's phone call.

The same day, Stennis requested a meeting with Schiele to discuss concerns raised by her students and her tenure process. ECF No. 37-18. Schiele responded that he had spoken with Human Resources about Stennis' concerns and requested that Sheila Hobson, Director of Human Resources, and Stevenson be present at the meeting. *Id.*; ECF No. 37-19. Stennis agreed to both Hobson and Stevenson's participation. ECF No. 37-19.

On November 19, 2013, Stennis again raised concerns to Stachura about her tenure process. ECF Nos. 37-10, 37-36. Stennis also mentioned that she had sought mediation with Stevenson, but he had declined the offer. ECF No. 37-10. The next day, Stachura further explored the possibility of mediation with Stevenson, although Stevenson again declined to participate. ECF Nos. 37-10, 37-20, 37-36.

On November 20, 2013, Stennis met with Stevenson, Schiele, and Hobson to discuss her concerns regarding her tenure application and her husband's call to the University President's office. ECF Nos. 37-16, 37-17, 37-37. During this meeting, Schiele raised the issue of student mis-advisement despite his previous determination that none had occurred. ECF No. 46-2. The

meeting otherwise, and almost exclusively, focused on the phone call that her husband made. *Id.* At the end of the meeting, Stevenson removed Stennis from her role as co-advisor of the Social Work Club. ECF Nos. 37-16, 37-17.[2] The stated reason for her removal was her husband's call. ECF Nos. 37-16, 37-17.

On November 21, 2013, Schiele emailed Stennis a summary of the November 20, 2013 meeting. ECF Nos. 37-16, 37-22, 37-37. Two days later, Stennis responded to Schiele, laying out her concerns with her tenure application and the work environment. ECF No. 46-10. Stennis specifically described having sought Stachura's assistance with "concerns related to tenure and perception that [her] chair would possibly try to derail [her] process, citing advisement as an example of something he may use." *Id.* Stennis, more particularly, described her reason for seeking Stachura's help was to "protect [herself] from workplace bullying and reprisal by [her] chair and other colleagues." *Id.*

In the same letter, Stennis also communicated to Schiele that Stevenson had just informed Stennis' female colleague that the colleague's contract would not be renewed so he could hire someone more in line with "his vision." *Id.* Stennis further described Stevenson's overt hostility to the student's request for a class on homosexuality: "[h]e didn't want his legacy to be that he introduced a class on some 'gay***'." *Id.* Stennis also noted that she had conveyed her concerns regarding Stevenson's bias and retaliatory acts to Schiele in the past. *Id.*

On November 24, 2013, Stennis informed Stachura that she had met with Schiele, Stevenson, and Hobson. ECF No. 37-15. Stennis further relayed that she was considering filing a grievance for the adverse actions with which Stachura was very familiar. *Id.*

_____

[2] Stennis points out that although Schiele stated that the decision to remove her as co-advisor was made by Stevenson, according to Stevenson, the decisionmaker was Hobson, and he merely relayed the decision. ECF No. 46.

On December 9, 2013, the three-member Departmental ART Committee, which had been formed at Stevenson's direction (ECF No. 37-16) reviewed Stennis' dossier and voted unanimously not to recommend her for tenure, citing deficiencies with her dossier. ECF Nos. 37-6, 37-25.[3] That same day, Stevenson informed Stennis that he, too, would not recommend her for tenure on largely the same grounds as those voiced by the Department's ART Committee. ECF Nos. 37-6, 37-25.

On December 13, 2013, Stevenson sent Schiele a memo outlining the reasons why he did not recommend Stennis for tenure. ECF Nos. 37-6, 37-17, 37-26. That same day, Stachura followed up with Schiele on the status of Stennis' tenure application. ECF Nos. 37-10, 37-36.

On January 26, 2014, after reviewing Stennis' tenure application, Schiele advised Stennis that he would not recommend her for tenure. ECF Nos. 37-27, 37-37. Although Schiele's memorandum acknowledged that Stennis had received "positive teaching evaluations," met "the standards of the department's guidelines" for scholarly productivity, and "engaged in considerable community service," Schiele expressed concern that she had been removed by Stevenson on three separate occasions from departmental service activities, two of which postdated Stennis sharing the student assessment with Stevenson. ECF No. 37-27. Of greatest concern to Schiele was Stennis' husband's call on behalf a student and Stennis' failure to "speak to [Schiele] about [the]

---

[3] The criteria for granting tenure are established by the University System of Maryland in its Policy on Appointment, Rank, and Tenure ("USM Policy"). ECF No. 46-4. Under the USM Policy, tenure determinations are based on three criteria: (1) teaching effectiveness, including student advising; (2) research, scholarship, and, in appropriate areas, creative activities or other activities that result in the generation and application of intellectual property through technology transfer; and (3) relevant service to the community, profession, and institution. *Id.* § II.B.1, p. II.1.00-8. The University adopted the USM Policy's criteria in its Faculty Handbook. ECF No. 46-5, Faculty Handbook. Stevenson and the DSW faculty developed another set of tenure guidelines that were not reviewed or approved by the University. ECF Nos. 46-3, 46-6 (DSW Tenure Guidelines). According to Stevenson, if the USM Policy and DSW Tenure Guidelines conflicted, the DSW Tenure Guidelines controlled. ECF No. 46-3. Stevenson also selected the three members of the DSW ART Committee which reviewed Stennis' tenure application. ECF No. 37-16.

matter." *Id.* Stennis' dossier was then sent to the University ART Committee, the Provost, and the President for final review and recommendation. ECF Nos. 37-3, 37-37.

On March 17, 2014, the University received a letter from Stennis' counsel alleging that Stevenson was retaliating against Stennis by thwarting her attempts at receiving tenure. ECF No. 37-28. The University responded on March 26, 2014, advising Stennis' counsel that the University had been working with Stennis to address her concerns. ECF No. 37-29.

On May 1, 2014, Stennis received her 2013–2014 performance evaluation which noted that she had been removed as co-advisor of the Social Work Club during the Fall 2013 semester but had been reassigned to another student organization for the Fall 2014 semester. ECF No. 37-6. Stennis responded to her evaluation on June 3, 2014, arguing that her removal as co-advisor was part of a larger EEOC investigation and thus should be deleted from her evaluation. ECF No. 37-31.

On May 9, 2014, the University awarded Stennis a merit adjustment, increasing her salary to $54,866.94. ECF No. 37-3. Three days later, on May 12, 2014, the University ART Committee voted to recommend that Stennis receive tenure. ECF Nos. 37-3, 37-6, 37-30.

On July 1, 2014, the University awarded Stennis tenure. ECF Nos. 37-3, 37-6, 37-32. A month and a half later, on August 14, 2014, Stennis resigned from the University to take a tenured position at Coppin State University as Chair and Associate Professor in the Department of Social Work. ECF Nos. 37-3, 37-33. In her new position, Stennis receives $30,000 more in salary than she did at BSU. ECF No. 37-3.

On May 5, 2016, Stennis filed suit against BSU alleging unlawful retaliation under Title VII, Title IX, and Maryland's Fair Employment Practices Act. ECF No. 1. On October 14, 2016, BSU moved to dismiss for failure to state a claim and failure to exhaust administrative remedies.

ECF No. 6. The Court held a motions hearing on January 12, 2017 and granted BSU's Motion to Dismiss on February 16, 2017. ECF Nos. 14–16. Stennis appealed the dismissal, which the United States Court of Appeals for the Fourth Circuit affirmed in part and vacated in part. ECF No. 23. The Fourth Circuit vacated the "portion of the district court's order dismissing Stennis' Title IX claim as it pertains to the department chair's attempts to deny her tenure." ECF No. 23-1 at 7. The Fourth Circuit noted that Stevenson altered Stennis' job duties and reduced her professional development opportunities, harming her chances to receive tenure, and further recommended denying her tenure. *Id.* at 6. The court held that a reasonable professor in Stennis' position could have concluded that these actions were materially adverse. *Id.* at 7.

Discovery thereafter ensued on Stennis' Title IX retaliation claim. On September 21, 2018, BSU filed a Motion for Summary Judgment, ECF No. 37, and Stennis responded and filed a Motion for Leave to File Excess Pages on October 19, 2018, ECF Nos. 45, 46.[4] BSU filed its Reply on November 2, 2018. ECF No. 47. A hearing on the Motion for Summary Judgment was held on February 21, 2019.

## II.      Standard of Review

Summary judgment is proper under Federal Rule of Civil Procedure 56(a) where no genuine dispute exists over any material facts, and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 302 (4th Cir. 2006). A dispute of material fact is genuine if the evidence would allow the trier of fact to return a verdict for the nonmoving party. *Anderson v.*

---

[4]      Memoranda in excess of thirty-five pages require leave of the Court. *See* L.R. 105.3. Stennis' Response exceeds this limit by six pages. ECF No. 45 ¶ 4. Stennis argues that the additional pages were necessary to address complex issues and a voluminous record. *Id.* ¶ 5. Although the Court believes less would have been more, BSU does not oppose the motion, and the memoranda is only six pages over the limit. The Court, therefore, grants Stennis' motion.

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The court may only rely on facts supported in the record.  *Felty v. Grave-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987).  Moreover, the court must view all facts and make all reasonable inferences in the light most favorable to the nonmoving party.  *Matsuhita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The nonmoving party must present more than a "mere scintilla" of evidence to demonstrate a genuine issue of material fact that would preclude summary judgment.  *Anderson*, 477 U.S. at 252.

### III.    Analysis

BSU principally argues that summary judgment must be granted in its favor because the University responded reasonably to Stennis' complaints.  ECF No. 37-1 at 13–17.  BSU alternatively argues that even if the Court determines that a genuine issue of fact precludes summary judgment on the adequacy of BSU's response, no evidence exists that Stevenson retaliated against Stennis because she reported alleged discrimination.  *Id.* at 17–25.  For the reasons discussed below, BSU's Motion must be denied.

#### A.  Imputing Liability to BSU for Stevenson's Retaliatory Acts

BSU first argues that assuming Stevenson retaliated against Stennis by adversely impacting her chances to receive tenure, insufficient evidence exists to impute Stevenson's misconduct to BSU.  *Id.* at 13–17.  Title IX prohibits recipients of federal education funding from "retaliating against a person who speaks out against sex discrimination."  *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174, 178 (2005) ("[W]hen a funding recipient retaliates against a person *because* he complains of sex discrimination, this constitutes intentional 'discrimination' 'on the basis of sex,' in violation of Title IX.");  *see* 20 U.S.C. § 1681(a).  An institution is liable for a Title IX violation only if "an official [with] authority to address the alleged discrimination and to institute corrective measures . . . has actual knowledge of discrimination in the [institution's] programs and fails

adequately to respond." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998). This failure must amount to "deliberate indifference to discrimination," *id.*, because the University's response to the allegations was "clearly unreasonable," *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 648 (1999). Undoubtedly, demonstrating deliberate indifference is demanding and correctly so. A university may be held accountable solely for "its own official decisions" rather than for "its employees' independent actions." *Id.* at 643; *Gebser*, 524 U.S. at 290–91.

BSU contends that the evidence, when viewed most favorably to Stennis, nonetheless shows that the University responded reasonably to her complaints. The Court disagrees.

First, actual knowledge of Stevenson's retaliatory acts may be imputed to the University. Stennis communicated to officials with authority to take corrective measures regarding Stevenson's attempts to sabotage her tenure chances. Stennis complained, repeatedly, to Stachura regarding Stevenson's increasing hostility toward Stennis' tenure chances beginning after Stennis had told Stevenson that the students viewed him as discriminatory and hostile to women and homosexuals. Stachura, notably, was the "Labor and Employee Relations Manager in the Office of Human Resources," and "Interim EEO Officer and Title IX Coordinator" for the University. ECF No. 37-36. Stachura thus occupied a position principally designed to rectify discriminatory conduct.

Similarly, Stennis also voiced similar complaints to Hobson, the University's Director of Human Resources, and Schiele, the Dean of the School of Professional Studies, at their November 21, 2013 meeting. ECF No. 37-37, Schiele Aff. ¶¶ 1, 5. Nowhere does the University contend that these individuals did not possess sufficient authority to rectify instances of discriminatory retaliation at the University. Thus, because the evidence viewed most favorably to Stennis shows

that she communicated to University officials who could take steps to remedy Stevenson's alleged retaliatory misconduct, BSU can be found to have actual knowledge of the discrimination.

Second, none of those with the authority did much, if anything, to investigate or remedy Stevenson's discriminatory conduct. Stachura, fully apprised of Stevenson's efforts to interfere with Stennis' tenure after Stennis submitted the assessment of him, merely advised Stennis to (1) "ask [Stevenson] for ways and areas" she could improve her performance, (2) meet with Schiele to discuss the situation even though she had already met with Schiele and Stevenson together, and (3) review the University Grievance Process set out in the BSU Faculty Handbook, a process which did not cover discrimination claims. ECF Nos. 46-2, 37-26, 37-15. By contrast, no evidence exists that Stachura initiated, contributed to, or participated in any formal or informal investigation of Stennis' complaints, even as Stennis shared with Stachura that Stevenson continued to remove Stennis from advisor posts and build his record against Stennis obtaining tenure. Surely a reasonable trier of fact could determine that Stachura, as an official with power to remedy the discrimination, acted unreasonably. *See Jennings v. Univ. of N.C.*, 482 F.3d 686, 694, 700–01 (4th Cir. 2007) (finding deliberate indifference where university lawyer advised student and victim of sexual harassment to discuss issues with perpetrator coach and "work it out"); *see also Feminist Majority Found. v. Hurley*, 911 F.3d 674, 689–90 (4th Cir. 2018) (finding university to be deliberately indifferent to student-on-student harassment when it failed to make "real effort to investigate or end the harassment and threats").

Stennis' meetings with Schiele, viewed most favorably to her, suffered a similar fate. No credible evidence exists that Schiele assisted in any investigation concerning Stevenson. Rather, the meeting between Schiele and Stennis, ostensibly to discuss Stennis' complaints about Stevenson, focused on Stennis' husband's phone call, not Stevenson's adverse actions. Schiele

then simply echoed Stevenson's reasons for recommending denial of tenure, while also extolling Stennis' academic virtues. ECF No. 37-27. When viewing the evidence most favorably to Stennis, a reasonable finder of fact could determine that Schiele did very little to investigate Stennis' complaints about Stevenson, and instead bolstered Stevenson's efforts to thwart Stennis' tenure chances.

BSU contends, however, that Stennis has conceded that an EEO investigation into Stevenson's alleged misconduct had taken place at BSU, thus compelling that summary judgment be granted in its favor. The Court finds no credible evidence supporting this contention. To be sure, after Stennis and other faculty members hired an attorney to file an EEOC formal complaint, the University asserted that its "investigation" would be completed within thirty days. ECF No. 37-29. However, that same letter described the "investigation" as the "University's Labor and Employee Relations Manager and EEO Officer" (Stachura) having "been in communication with [Stennis] for some time in an effort to address [her] concerns." *Id.* As already discussed, a reasonable factfinder could determine that Stachura's conduct amounted to no investigation at all. Accordingly, this letter does not support BSU's contention that it had performed an adequate investigation.

Similarly, Stennis' oblique reference to an EEO investigation in her response to her 2014 performance evaluation is of little moment. Stennis certainly noted in her May 2014 response that the matter of Stevenson's removal of Stennis as co-advisor of the Social Work Club was "being investigated within a larger EEOC context." ECF No. 37-31.[5] However, this phrase, construed

---

[5]    The only other evidence of any BSU investigation is its cherrypicked reference to Stennis having been interviewed by the University's Title IX officer in her answer to interrogatories. However, read in context, Stennis' answer fairly refers to the period *after* she sought counsel and the University no longer permitted Stachura to talk with Stennis. Stennis' answer reads in full:

> Once Plaintiff was quite certain that Stephenson [sic] was mounting an effort to smear Plaintiff's professional reputation, Plaintiff tried to schedule a follow- up meeting with Statura [sic]. However,

most favorably to Stennis, can be read to mean that through counsel, she had informed the University that an EEO investigation would be forthcoming *precisely because* the University had taken no steps to address her complaints.  *Cf. Jennings*, 482 F.3d at 701 (explaining that a "[u]niversity's failure to take any action to remedy the situation would allow a rational jury to find deliberate indifference to ongoing discrimination"); *Gebser*, 524 U.S. at 290 (recognizing that school is deliberately indifferent where it makes "official decision" not to remedy Title IX violation).  Viewing the evidence in the light most favorable to Stennis, as this Court must, a reasonable factfinder could determine that the University's response amounted to deliberate indifference.  Accordingly, BSU's Motion for Summary Judgment on this ground is denied.

### B.  Sufficiency of Evidence on Retaliation Claim

BSU alternatively argues that summary judgment must be granted in its favor because, viewing the facts most favorably to Stennis, her retaliation claims fail as a matter of law.  ECF No. 37-1 at 17–25.  The Fourth Circuit has previously determined that Stennis' Title IX claim should proceed "as it pertains to [Stevenson's] attempts to deny her tenure."  ECF No. 23-1 at 7.  The University identifies the following as Stevenson's adverse action: (1) assigning Stennis a co-advisor to the Social Work Club; (2) removing Stennis as a co-advisor to the Social Work Club; and (3) recommending that Stennis not be awarded tenure.  ECF No. 37-1 at 18. Stennis adds that Stevenson also manufactured Stennis' "mis-advisement" and cancellation of class without notice.  ECF No. 46 at 31–32.

---

this meeting was denied.  Because Plaintiff had already secured external legal counsel to assist in resolving this issue, Statura [sic] was unable to be get involved, as she was an agent of the university.  Plaintiff also spoke with the Title IX officer who interviewed Plaintiff (and Dr. Emory Perkins) regarding issues of this case.

ECF No. 37-9, Stennis' Resps. to Def.'s Interrogs. at 18–19.  The Court could find no other reference in Stennis' deposition to being interviewed by a University Title IX officer other than those who have already been discussed in this Opinion.

The Fourth Circuit has previously adopted the retaliation standard developed in the Title VII context. *Preston v. Virginia ex rel. New River Cmty. Coll.*, 31 F.3d 203, 207 (4th Cir. 1994). To prevail on a retaliation claim, the employee must show that "(1) [s]he engaged in a protected activity; (2) the employer took an adverse employment action against h[er]; and (3) a causal connection existed between the protected activity and the asserted adverse action." *Adams v. Giant Food, Inc.*, 225 F. Supp. 2d 600, 605 (D. Md. 2002) (citing *Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 271 (4th Cir. 2001)).

Protected activities "fall into two distinct categories: participation or opposition." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998). Participation activities include: "(1) making a charge; (2) testifying; (3) assisting; or (4) participating in any manner in an investigation, proceeding, or hearing under Title VII." *Id.* Opposition activity includes "utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." *Id.* "Employees engage in protected oppositional activity when, inter alia, they complain to their superiors about suspected violations of Title VII." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015) (internal quotation marks and citations omitted). While a plaintiff bringing a claim under the opposition clause "need not establish that the employment practice he opposed in fact violated Title VII," the plaintiff must "at a minimum have held a reasonable good faith belief at the time he opposed an employment practice that the practice was violative of Title VII." *Adams*, 225 F. Supp. 2d at 606. Protected activity "does not include opposition to 'all unlawful practices' or 'practices the employee simply thinks are somehow unfair'; the employee must have 'actually opposed employment practices made unlawful by the [antidiscrimination statute].'" *Sara Kaye*

*Ruffner v. MD OMG EMP LLC*, No. WDQ-11-1880, 2012 WL 3542019, at *3 (D. Md. Aug. 13, 2012).

To be considered "adverse," an employment action must be one that a "reasonable employee would have found . . . materially adverse." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). In other words, the employer's conduct must be sufficiently adverse so as to dissuade a reasonable worker from "making or supporting a charge of discrimination." *Id.* (citation omitted). In this respect, the action need not affect the terms and conditions of employment, *id.* at 64, so long as the plaintiff experiences "some direct or indirect impact" on her "employment as opposed to harms immaterially related to it," *Adams v. Anne Arundel Cty. Pub. Schs.*, 789 F.3d 422, 431 (4th Cir. 2015). In this case, the Fourth Circuit reasoned that "[t]enure is a material condition of employment because it provides long-term job security," and "[i]t is reasonable to conclude that a professor's tenure application would be negatively affected if the chair of her department opposed her application." ECF No. 23-1 at 7 (quoting *Tolbert v. Smith*, 790 F.3d 427, 435 (2d Cir. 2015)).

"[A] causal connection for purposes of demonstrating a prima facie case [of retaliation] exists where the employer takes adverse employment action against an employee shortly after learning of the protected activity." *Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004), *abrogated on other grounds by Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243 (4th Cir. 2015). In cases where temporal proximity is missing, evidence of "recurring retaliatory animus" may satisfy the causation element. *Lettieri v. Equant Inc.*, 478 F.3d 640, 650 (4th Cir. 2007).

Once a plaintiff establishes the elements of her prima facie case, the burden shifts to the employer to proffer evidence of a legitimate, non-retaliatory reason for its action. *See Laughlin*, 149 F.3d at 258. Upon such a showing, the burden shifts back to the plaintiff to demonstrate that

the employer's non-retaliatory reasons were pretext for retaliation. *Id.* "Throughout this process, the employee bears the burden of establishing that her protected activity 'was a but-for cause' of the alleged adverse action." *Rome v. Dev. Alts., Inc.*, 587 F. App'x 38, 40 (4th Cir. 2014) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013)).[6]

"To show pretext, a plaintiff must proffer sufficient evidence such that a reasonable trier of fact could conclude that the employer's explanation is false or unworthy of credence, and that discrimination or retaliation was the true reason for the adverse employment action." *Hart v. Lew*, No. ELH-12-03482, 2015 WL 521158, at *23 (D. Md. Feb. 6, 2015) (citations omitted). "[W]eaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions" all may constitute evidence of discriminatory animus. *Fordyce v. Prince George's Cty.*, 43 F. Supp. 3d 537, 550 (D. Md. 2014) (quoting *Pastran v. K-Mart Corp.*, 210 F.3d 1201, 1206 (10th Cir. 2000)). Moreover, close temporal proximity between a plaintiff's protected activity and the adverse action taken against her, and failure to abide by regular procedures, are probative of pretext. *See Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 295–99 (4th Cir. 2010); *Basil v. Md. Transp. Auth.*, No. RDB-12-0556, 2014 WL 1622321, at *7 (D. Md. Apr. 23, 2014) (citing *Taylor*, 3 F. Supp. 3d at 473 n.6 (D. Md. 2014)). However, "[i]t is not enough for [a plaintiff] to allege pretext based on her own view of the truth; in order to rebut [an employer's] non-discriminatory reason, [a

---

[6]     In *Nassar*, the Supreme Court held that to establish causation for Title VII retaliation claims, a plaintiff must demonstrate "but-for" causation or "that the harm would not have occurred" in the absence of the defendant's conduct. *Nassar*, 570 U.S. at 346–47 (citation omitted). Stennis notes that some courts have questioned whether the *Nassar* holding applies to the summary judgment stage, suggesting that the plaintiff's burden at this stage requires only a prima facie showing of materiality. ECF No. 46 at 33 n.9. However, the cases on which she relies do not support this reading. *Id.* (citing *Brown v. Johns Hopkins Hosp.*, No. RDB-13-3258, 2014 U.S. Dist. LEXIS 109499, at *1, *22–23 (D. Md. Aug. 7, 2014) (disposing of a motion to dismiss); *Skrzecz v. Gibson Island Corp.*, No. RDB-13-1796, 2014 U.S. Dist. LEXIS 95047, at *39 n.11 (D. Md. July 11, 2014) (declining to address whether *Nassar* applies to FLSA retaliation claims); *Taylor v. Peninsula Reg'l Med. Ctr.*, 3 F. Supp. 3d 462, 472–73 (D. Md. 2014) (discussing how *Nassar* does not significantly impact the analysis of causal connection based on temporal proximity between the protected activity and adverse employment action)).

plaintiff's] task is to proffer evidence showing that [an employer's] stated reason was not the real reason for its actions." *Khoury v. Meserve*, 268 F. Supp. 2d 600, 615 (D. Md. 2003).

The Court now addresses the sufficiency of each claimed adverse action, viewing the facts most favorably to Stennis.

### i. Assignment of a Co-Advisor

Within a week after Stennis presented the assessment to Stevenson, Stevenson assigned Stennis a co-advisor to the Social Work Club. The University urges the Court that because the assessment failed to overtly mention sex discrimination, it does not constitute protected activity. ECF Nos. 37-1 at 20, 47 at 4–6. Rather, says BSU, the first mention of discrimination occurred during the September 11, 2013 meeting with Stennis, Stevenson, and Schiele, two days after Stevenson assigned co-advisors. ECF No. 37-1 at 20. BSU reads the record too narrowly.

The evidence viewed most favorably to Stennis supports that Stevenson knew about, and in fact asked for, the assessment because of student complaints regarding his hostile treatment of homosexual and female students. Further, the memorandum itself notes the students' belief that Stevenson's actions amount to "clear evidence of unfair discrimination and favoritism." ECF No. 37-5. "If not addressed," the memorandum continues, "such actions could warrant a decrease in SOWK [social work] majors, more clearly seen faculty discord, and even legal actions, (ie. Law suits)." *Id.* Reading this memorandum in context, it communicates the students' belief that Stevenson was engaging in illegal discrimination, and Stennis' role in forwarding such views amounted to protected activity.

The University alternatively argues that it is still entitled to summary judgment because Stennis has failed to rebut Stevenson's articulated reasons to assign a co-advisor. ECF Nos. 37-1 at 21; 47 at 6–7. Although Stevenson claimed to have assigned a co-advisor "[i]n an attempt to

become more transparent and collegial," (ECF No. 37-8), he also admitted that the assessment prompted the decision:

> During this meeting [on September 11, 2013 with Schiele and Stennis], I reiterated to the candidate [Stennis] that the stated request to provide an "*assessment of the chair*" was never granted by me. I further explained that it was inappropriate for students to provide an assessment of the Chair, and equally inappropriate for her to serve in the capacity of an advisor to sanction such inappropriate behavior. I then explained that I was also concerned about the memo being dated for May 20, 2013 when, according to the Social Work Club Constitution and Bylaws, newly elected members assume their elected roles on May 10. Even if requested, such an "assessment" could not be accurately done within 10 days. As a result of what I considered to be inappropriate behavior, I assigned another faculty member to serve as co-advisor to the Social Work Club.

ECF No. 37-17 (italics in original).

By Stevenson's own admission, therefore, a causal connection exists between Stennis' protected activity and the assignment of a co-advisor. A finder of fact, therefore, must assess Stevenson's competing explanations for assigning co-advisors and determine whether he indeed did so to dampen Stennis' chances of receiving tenure.

### ii. Removal as Co-Advisor

As to Stevenson's removal of Stennis as co-advisor of the Social Work Club, BSU argues that because Stennis "admits" she had been removed as co-advisor on account of her husband's call to the University, Stennis cannot prove that her removal was in retaliation for her protected activity. ECF No. 37-1 at 22–23 (citing ECF No. 37-3, Stennis Dep. 82:2–14). The Court is not convinced that Stennis' testimony affirming that she understood Stevenson's *stated* reason for her removal somehow renders the reasoning non-pretextual. Indeed, stated reasons are usually the grounds upon which an employee will "understand" adverse action ensued. But this does not make the stated reason legitimate.

Undoubtedly at trial, Stennis will be required to demonstrate that the stated reason for this action was pretextual. The Court finds sufficient evidence exists to allow Stennis this opportunity. First, the Court notes that no rational relationship exists between the "punishment and the crime"; that is, no evidence suggests that Stennis' role as advisor of the Social Work Club bears any rational relationship to her husband calling the University to advocate for a student with whom the Stennis family had grown close. This disconnect alone could cause a reasonable trier of fact to disbelieve the proffered reason for removal.

Secondly, in May of 2014, Stevenson indicated that he would "reassign" Stennis to another student organization during the Fall 2014 semester. ECF No. 46-11. This decision could support a finding that Stennis' removal was not because of her husband's phone call, but rather as a retaliatory attempt to end her tenure chances. Put differently, if the stated reason for Stennis' removal as co-advisor was legitimate in September 2013, then it would have still been so on May 2014. Stevenson's own about-face on this point is sufficient to allow the question of pretext to reach the jury.

### iii. Recommendation Not to Award Tenure

Similarly, BSU contends that no rational trier of fact could find Stevenson's denial of tenure recommendation to be other than legitimate and non-pretextual. ECF No. 37-1 at 23–25; ECF No. 47 at 7–9. BSU relies primarily on Stevenson's December 13, 2013, memorandum in which he characterizes the "candidate's dossier [as] disorganized, incomplete, and lack[ing in] detail"; notes that the "dossier contains letters of support from [BSU] faculty and staff that are outdated and do not have signatures"; and "expresse[s] concerns regarding student advisement . . . [and] level of professionalism and appropriateness for the department." ECF No. 37-17. BSU also highlights that Stevenson took issue with certain aspects of Stennis' performance in 2012.

ECF No. 37-1 at 24 (citing ECF No. 37-3, Stennis Dep. 65:4–73:18); ECF No. 47 at 7–8. BSU lastly contends that Stevenson's recommendation must be credited as legitimate because it aligns with that of the Departmental ART Committee.[7] ECF No. 37-1 at 24–25; ECF No. 47 at 9.

However, simply because BSU can point to some evidence which may substantiate Stevenson's stated reasons does not mean that summary judgment must be granted in its favor. This is especially the case where the University ART Committee, the Provost, and the President *disagreed* with Stevenson and, as a result, Stennis received tenure. ECF Nos. 37-30, 37-32. Additionally, that Stevenson's views on Stennis' qualifications changed after Stennis presented the assessment points toward pretext. Before Stennis had presented Stevenson with the assessment, Stevenson had compared Stennis' dossier to another faculty member who had been granted tenure and concluded that if the other individual received tenure, Stennis would as well. ECF No. 46-7. But after the assessment, Stennis was no longer worthy of support. A finder of fact must be permitted to weigh whether Stevenson's shifting position signifies retaliatory motive.

Second, Stennis highlights that Stevenson relied on the Social Work Department's own tenure criteria, not the USM Policy or Faculty Handbook criteria approved by the University. ECF No. 46 at 37–38. She argues that Stevenson's failure to adhere to the University-approved criteria in the Faculty Handbook is evidence of pretext. *Id.* BSU, in response, underscores that the USM Policy provides that "[t]he activities considered to be within the criteria for promotion and tenure shall be flexible and expansive," ECF No. 46-4, USM Policy, § II.B.2, p. II.1.00-8, and that Stevenson testified that "[f]lexible and expansive as it relates to tenure and promotion to [him] is addressing issues of professionalism, collegiality; those types of things," ECF No. 47-1. But this does not render the discrepancy in the criteria used for Stennis non-pretextual as a matter of law.

_____

[7] No individual on the Departmental ART Committee knew of Stennis' alleged reporting of discrimination. ECF No. 37-3 at 104.

Quite the opposite: it must be left to the jury to determine whether Stevenson's reliance on criteria different than that endorsed by the University points toward pretext.

Stennis also rightfully emphasizes that a jury may consider the temporal proximity between submitting the assessment and Stevenson's refusal to recommend tenure as part of a "retaliatory campaign" throughout Fall of 2013. ECF No. 46 at 39. A jury may view Stevenson's denial of a tenure recommendation not in isolation, but as a pattern of adverse action. In this context, it will be left to the jury to decide whether Stevenson's stated reasons for denying tenure were pretextual or legitimate.

BSU also argues that Stevenson's decision to recommend that Stennis not be awarded tenure is legitimate and non-discriminatory, as a matter of law, because it mirrored the earlier submitted Departmental ART Committee's recommendation. ECF No. 47 at 9. Accordingly, BSU maintains that no reasonable jury could conclude Stennis' protected activity was the but-for cause of Stevenson's negative tenure recommendation. *Id.* To be sure, the Departmental ART Committee's recommendation aids BSU's efforts to demonstrate that Stevenson's rationale was legitimate. On this record, however, it cannot compel a finding in BSU's favor. Indeed, Stevenson hand-picked the Departmental ART Committee members, one of whom was within his Department. In this respect, a jury may view with a jaundiced eye the Departmental ART Committee's recommendation, especially because it happened to echo Stevenson's views with uncanny precision. *Compare* ECF No. 37-24, Dec. 9, 2013, letter (noting that "[t]he overall dossier lacked expected professional organization and coherency" and "was missing several important documents"; "there was [a] lack of discussion and coherent evidence to substantiate excellence in teaching"; and "there was a lack of strong evidence . . . to support the candidate's communication across curriculum"), *with* ECF No. 37-17, Dec. 13, 2013, memo (stating "candidate's dossier is

disorganized, incomplete, and lacks detail"; "dossier contains letters of support from [BSU] faculty and staff that are outdated and do not have signatures"; and "concerns regarding student advisement . . . [and] level of professionalism and appropriateness for the department"). Further, the jury is entitled to consider that the University ART Committee disagreed with Stevenson and recommended tenure. This alone allows a reasonable trier of fact to conclude that Stennis was indeed qualified to receive tenure and that Stevenson's contrary position, in combination with his other adverse actions against Stennis, was pretextual.[8]

## IV.    Conclusion

In sum, when viewing the evidence most favorably to Stennis, genuine issues of fact regarding imputed liability to BSU and Stevenson's motivation for actions adverse to Stennis receiving tenure preclude summary judgment. Defendant's motion is therefore DENIED. A separate order follows.


Date:  April 5, 2019                                  _____/S/_____
                                                      Paula Xinis
                                                      United States District Judge

---

[8]      Stennis briefly argues that Stevenson's intimidating emails beginning in the Fall 2013 constitute an adverse employment action. ECF No. 46 at 31–32. The only adverse actions before the Court "pertain[] to [Stevenson's] attempts to deny her tenure." ECF No. 23-1 at 7. The Court therefore confines its summary judgment analysis to Stevenson's adverse actions regarding her tenure process.